**MILBANK LLP**
Matthew L. Brod
Connor J. Haynes (*pro hac vice* pending)
55 Hudson Yards
New York, NY 10001
Tel:    (212) 530-5000
Fax:    (212) 530-5219

-and-

Andrew M. Leblanc
Samir L. Vora (*pro hac vice* pending)
1850 K Street, NW, Suite 1100
Washington, DC US 20006
Tel:    (202) 835-7500
Fax:    (202) 263-7586

*Counsel for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| | Case No. 21-_____ (___) |
| **Modernland Overseas Pte. Ltd.** *et al.*,[1] | **(Joint Administration Requested)** |
| **Debtors in a Foreign Proceeding.** | |

**MOTION FOR (I) RECOGNITION OF FOREIGN MAIN
PROCEEDINGS, OR IN THE ALTERNATIVE FOREIGN NONMAIN
PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
(III) RECOGNITION OF SANCTION ORDERS AND RELATED SCHEMES,
AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

---

[1]   The Debtors in these chapter 15 cases (the "Chapter 15 Cases") are: (a) Modernland Overseas Pte. Ltd., which is incorporated and registered in Singapore with unique entity number 201314695N; and (b) JGC Ventures Pte. Ltd., which is incorporated and registered in Singapore with unique entity number 201826857D.  Both entities have their registered office at 1 Marina Boulevard, #28-00, Singapore 018989.

# TABLE OF CONTENTS

**Page**

Relief Requested ................................................................................................ 3

Jurisdiction and Venue ....................................................................................... 4

Background ......................................................................................................... 5

    I.      The Debtors' Business Operations ........................................................ 5

    II.     Summary of the Debtors' Pre-Scheme Capital Structures ..................... 9

    III.    Events Preceding Commencement of the Singapore Proceedings ....... 10

    IV.    Description of the Schemes ................................................................. 13

    V.     The Singapore Proceedings and the Moratoria Applications .............. 15

    VI.    The Chapter 15 Cases ........................................................................ 23

Basis for Relief ................................................................................................ 23

    I.      The Singapore Proceedings are Entitled to Recognition Pursuant to Section 1517 of the Bankruptcy Code as Foreign Main Proceedings, or in the Alternative as Foreign Nonmain Proceedings. ..................................... 23

    II.     The Debtors May Be Entitled to Certain Relief Automatically Under 11 U.S.C. § 1520. ................................................................................... 32

    III.    Enforcement of the Schemes and the Sanction Orders and Other Discretionary Relief Is Warranted. ..................................................... 33

    IV.    The Relief Requested Herein Is Consistent With the Public Policy of the United States. ..................................................................................... 42

    V.     Chapter 15 Case Closure .................................................................... 46

Notice............................................................................................................... 47

No Prior Request .............................................................................................. 47

Conclusion ....................................................................................................... 48

1.    William Honoris, in his capacity as the duly appointed foreign representative (the "Petitioner" or "Foreign Representative") of Modernland Overseas Pte. Ltd. ("Modernland Overseas") and JGC Ventures Pte. Ltd. ("JGC Ventures" and, together with Modernland Overseas, the "Debtors"), each of which is the subject of a foreign proceeding (collectively, the "Singapore Proceedings") pending before the General Division of the High Court of the Republic of Singapore (the "Singapore Court"), pursuant to Section 71 of the Insolvency, Restructuring and Dissolution Act 2018 (No. 40 of 2018) (the "IRDA") concerning respective schemes of arrangement (the "Schemes"), by and through his undersigned counsel, hereby respectfully submits this *Motion for (I) Recognition of Foreign Main Proceedings, or in the Alternative Foreign Nonmain Proceedings, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Orders and Related Schemes, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Motion" and, together with the Official Form 401 Petitions and the statements and lists attached thereto filed contemporaneously herewith for each Debtor, the "Chapter 15 Petitions") and represents as follows.

## Relief Requested

2.    By this Motion, the Petitioner respectfully requests, pursuant to sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520, 1521, and 1522 of title 11 of the United States Code (the "Bankruptcy Code"), entry of an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"): (i) recognizing the Singapore Proceedings as "foreign main proceedings" pursuant to chapter 15 of the Bankruptcy Code, or in the alternative "foreign nonmain proceedings"; (ii) recognizing William Honoris as a "foreign representative," as defined in section 101(24) of the Bankruptcy Code, in respect of the Singapore Proceedings; (iii) recognizing, granting comity to, and giving full force and effect in the United States to the Singapore Proceedings, the Schemes, and the Sanction Orders (as defined below); (iv) enjoining parties from

3

taking any action inconsistent with the Schemes or the Sanction Orders in the United States; and (v) granting such other relief as the Court deems just and proper.  In addition, the Petitioner respectfully requests, pursuant to sections 350(a) and 1517(d) of the Bankruptcy Code, authorization to seek entry of an order (the "Proposed Final Order"), to close these Chapter 15 Cases upon notice of presentment and deeming this Motion to be the final report required to be filed by the Foreign Representative.  The relief requested in this Motion is without prejudice to any additional relief the Foreign Representative may request.

3.      In support of the Chapter 15 Petitions, the Petitioner refers the Court to the statements contained in: (a) the *Declaration of William Honoris in Support of the Motion for (I) Recognition of Foreign Main Proceedings, or in the Alternative Foreign Nonmain Proceedings, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Orders and Related Schemes, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Foreign Representative Declaration"); (b) the *Declaration of Meiyen Tan in Support of the Motion for (I) Recognition of Foreign Main Proceedings, or in the Alternative Foreign Nonmain Proceedings, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Orders and Related Schemes, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Foreign Law Expert Declaration"); and (c) the *Statements and Lists Pursuant to Section 1515(c) of the Bankruptcy Code and Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(4) and 7007.1 and Local Rule 1007-3*, all of which have been filed contemporaneously herewith and are incorporated herein by reference.

## Jurisdiction and Venue

4.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code, as well as the *Amended Standing Order of Reference* dated January 31,

2012, Reference M-431, <u>In re Standing Order of Reference Re: Title 11</u>, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

5.     Venue is proper under 28 U.S.C. § 1410 as the Debtor has assets within the United States located in New York, as described further herein.

6.     The Petitioner has properly commenced these Chapter 15 Cases under sections 1504 and 1509 of the Bankruptcy Code by the filing of the Chapter 15 Petitions for recognition of the Singapore Proceedings under section 1515 of the Bankruptcy Code.

### Background

## I.     The Debtors' Business Operations

7.     Each Debtor is incorporated under the laws of Singapore with registered offices in Singapore. Foreign Representative Declaration ¶ 5. The registered address of both Debtors is 1 Marina Boulevard, #28-00, Singapore 018989. <u>Id.</u> The Debtors' mail is received at the Debtors' Singapore address, and one of their two directors also resides in Singapore. JGC Ventures maintains a bank account in Singapore, as did Modernland Overseas until last year. All of the Debtors' statutory books and records are kept at their registered address in Singapore, including (i) registers of directors, members, and charges and (ii) copies of board minutes and minutes of annual general meetings. <u>Id.</u>

8.     The Debtors are part of a group of companies (the "<u>Modernland Group</u>" or "<u>Group</u>") comprised of PT Modernland Realty Tbk ("<u>PT Modernland</u>") and its subsidiaries, including: (a) PT Mitra Sindo Sukses; (b) PT Mitra Sindo Makmur; (c) PT Modern Graha Lestari; (d) PT Modern Industrial Estat; (e) PT Modern Mutiara Makmur; (f) PT Modern Panel Indonesia; (g) PT Modern Mitra Pratama; (h) PT Modern Mitrakarya Serasi; (i) Marquee Land Pte. Ltd.; (j) Modernland Overseas; and (k) JGC Ventures. <u>Id.</u> ¶ 6. The Group's organizational structure is illustrated below.



9.     The Modernland Group is one of Indonesia's largest and most prominent property developers, with various high-profile projects.  The Group develops and operates townships, residential projects, industrial estates, and hospitality developments.  The Group also holds investments in three joint ventures with other leading Indonesian property developers, namely PT Astra Land Indonesia, PT Lotte Land Indonesia, and PT Waskita Karya Realty.  Id. ¶ 7.

10.    JGC Ventures was formed for the purpose of issuing debt securities to, *inter alia*, repay existing credit facilities and refinance indebtedness of the Group.  The Group raised funds in Singapore through the issuance of the US$150,000,000 10.75% guaranteed senior notes due 2021 (the "2021 Notes") pursuant to a New York law governed indenture dated August 30, 2018 (the "2021 Indenture"), by and among JCG Ventures, as issuer, The Bank of New York Mellon, London Branch, as trustee, The Bank of New York Mellon, Singapore Branch, as collateral agent, and PT Modernland and the subsidiary entities listed in Schedule I of the 2021 Indenture, as guarantors.  The 2021 Notes are listed on the Singapore Exchange.  Id. ¶ 8.

11.    The cash proceeds from the issuance of the 2021 Notes were contributed to MDLN Holdings Pte. Ltd. ("MDLN Holdings"), a wholly owned subsidiary of JGC Ventures incorporated in Singapore, by way of an intercompany loan.  MDLN Holdings loaned these same cash proceeds to PT Modernland pursuant to another intercompany loan, and PT Modernland used these proceeds for a variety of Group purposes, including:  (i) funding, up to US$59.3 million, the redemption of certain notes issued by a subsidiary of PT Modernland; (ii) repaying, up to US$40.7 million, all amounts outstanding under certain credit facilities and loans involving PT Modernland and other Group entities; (iii) funding, up to US$30 million, the acquisition of land; and (iv) the remainder to fund the general corporate purposes of MDLN Holdings and PT Modernland.  Id. ¶ 9.  The

intercompany loans from JGC Ventures to MDLN Holdings, and from MDLN Holdings to PT Modernland, are both governed by Singapore law.  Id.

12.     As with JGC Ventures, Modernland Overseas also was formed for the purpose of issuing debt securities to, *inter alia*, repay existing credit facilities and refinance indebtedness of the Group.  Id. ¶ 10.  The Group raised funds in Singapore through the issuance of the US$240,000,000 6.95% guaranteed senior notes due 2024 (the "2024 Notes") pursuant to a New York law governed indenture dated April 13, 2017 (the "2024 Indenture" and, together with the 2021 Indenture, the "Notes Indentures")*,* by and among Modernland Overseas, as issuer, The Bank of New York Mellon, London Branch, as trustee, The Bank of New York Mellon, Singapore Branch, as collateral agent, and PT Modernland and certain subsidiary entities named in the 2024 Indenture, as guarantors.  The 2024 Notes are listed on the Singapore Exchange.  Id.

13.     The cash proceeds from the issuance of the 2024 Notes were contributed to MLand Singapore Pte. Ltd. ("MLand"), a wholly owned subsidiary of Modernland Overseas incorporated in Singapore, by way of (i) a subscription for additional ordinary shares in MLand and (ii) an intercompany loan between Modernland Overseas and MLand.  MLand then loaned these cash proceeds to PT Modernland pursuant to another intercompany loan, and PT Modernland used these proceeds for a variety of Group purposes, including:  (i) US$209.2 million to fund the partial redemption of certain notes issued by a subsidiary of PT Modernland; (ii) US$15.0 million to repay all amounts outstanding under the credit facility between PT Modernland and Standard Chartered Bank; and (iii) US$9.8 million for general corporate purposes of PT Modernland.  Id. ¶ 11.  The intercompany loans from Modernland Overseas to MLand, and from MLand to PT Modernland, are both governed by Singapore law.  Id.

14.     Accordingly, the business and operations of the Debtors are all located in Singapore.  The Debtors do not have operations or material assets outside of Singapore.  Id. ¶ 12.

## II.     Summary of the Debtors' Pre-Scheme Capital Structures

### A.     *JGC Ventures*

15.     JGC Ventures' financial indebtedness consists, among other things, of the US$150,000,000 in principal amount of 2021 Notes outstanding under the 2021 Indenture.  The 2021 Notes are guaranteed by PT Modernland and the subsidiary entities listed in Schedule I of the 2021 Indenture, and are secured by:

(a)     charges by PT Modernland on the shares of JGC Ventures, and by JGC Ventures on the shares of MDLN Holdings;

(b)     an assignment by MDLN Holdings of all its interest in and rights under the intercompany loan dated August 30, 2018, entered into between MDLN Holdings, as lender, and PT Modernland, as borrower, in respect of the proceeds of the 2021 Notes; and

(c)     an assignment by JGC Ventures of all its interest in and rights under the intercompany loan dated August 30, 2018, entered into between JGC Ventures and MDLN Holdings in respect of the proceeds of the 2021 Notes.

Id. ¶ 13.

### B.     *Modernland Overseas*

16.     Modernland Overseas' financial indebtedness consists, among other things, of the US$240,000,000 in principal amount of 2024 Notes outstanding under the 2024 Indenture.  The 2024 Notes are guaranteed by PT Modernland and certain subsidiary entities named in the 2024 Indenture, and are secured by:

(a)     charges by PT Modernland on the shares of Modernland Overseas, and by Modernland Overseas on the shares of MLand; and

(b)     an assignment by MLand of all its interest in and rights under the intercompany loan dated April 13, 2017, entered into between MLand, as lender, and PT Modernland, as borrower, in respect of the proceeds of the 2024 Notes.

<u>Id.</u> ¶ 14.

### III.   Events Preceding Commencement of the Singapore Proceedings

17.    The Indonesian economy has been severely affected by the global COVID-19 pandemic.  In response to the pandemic, the government of Indonesia (the "<u>Government</u>") instituted lockdowns, business shutdowns, quarantines, and restrictions on travel.  On March 31, 2020, by virtue of Presidential Decree No. 11 of 2020, the President of Indonesia declared COVID-19 a Public Health Emergency (Darurat Kesehatan Masyarakat) and on April 13, 2020, through Presidential Decree No. 12 of 2020, he declared a National Disaster (Bencana Nasional).  <u>Id.</u> ¶ 15.

18.    The Government thus implemented various protective measures, including temporary travel restrictions, temporary closures of schools and workplaces, and restrictions on religious activities.  These measures, which were implemented with particular vigor in the Greater Jakarta area where all of the Group's major projects are located, caused unprecedented drops in GDP and economic productivity and significant increases in unemployment levels.  <u>Id.</u> ¶ 16.

19.    Following the outbreak of the pandemic, Indonesia announced a fall in its GDP growth rate for the second quarter to -5.3%, as well as a significant depreciation of the IDR against the USD.  Moreover, there still exists significant uncertainty in relation to the near- and long-term impact of the pandemic in Indonesia, which has further heightened economic uncertainty.  <u>Id.</u> ¶ 17.

20.    The pandemic and the consequent government restrictions and changes in social behavior have had an unprecedented impact on the Indonesian business and macro-economic environment.  <u>Id.</u> ¶ 18.

21.    In this regard, over 95% of the Group's revenue is derived from the sale (or presale) and development of residential, township, and industrial houses, apartments, land, and commercial

outlets.  The remaining 5% of revenue is earned from hospitality, which include a golf course and hotels and their associated function and entertainment offerings.  Id. ¶ 19.

22.    Given the nature of the Group's activities, the business of the Group has been significantly impacted by the pandemic. Id. ¶ 20. In particular, the following factors have materially and adversely affected the Group's cash flows and the payments from MDLN Holdings to JGC Ventures and from MLand to Modernland Overseas, and consequently, the Debtors' abilities to repay the 2021 Notes and 2024 Notes (together, the "Notes"):

(a)    disruptions to residential sales processes, such as:  (i) economic uncertainty causing a large portion of the Group's customer base to delay purchases; (ii) difficulties in reaching the Group's customers through physical viewings, physical launch events, and other traditional real estate sales channels; and (iii) cancellations by residential real estate purchasers;

(b)    reduced demand for land in the Group's industrial estates and disruptions to the industrial sales process;

(c)    temporary closures of hospitality premises due to local Government closure regulations (Pembatasan Sosial Berskala Besar) ("PSBB") and ongoing Government inspections since re-opening, which have disrupted activities of the Group's hospitality operations;

(d)    disruptions or suspensions of operational and construction activities for both residential and industrial estates and labor shortages due to restrictions on employees' and contractors' ability to travel.  As a substantial proportion of residential customers have mortgages obtained from local banks and disbursements pursuant to the mortgages are made on a construction progress/milestone basis, the disruptions in construction activities have caused a significant decline in the Group's payment collections;

(e)    customers cancelling contracts or withholding construction progress/milestone payments due to general uncertainty, changes in their financial circumstances, or speculation of Indonesia property values; and

(f)    incurrence of additional expenses to comply with PSBB, such as temperature checks, mandatory use of face masks and provision of hand sanitizers within indoor premises, increasing the frequency of disinfection of facilities, and providing employees with personal protective equipment.

Id.

23.     The combined effect of the above factors resulted in a substantial downturn in sales and collections in the five month period from April 1, 2020, to August 31, 2020, particularly when compared against the preceding five month period in 2019.  Id. ¶ 21.

24.     As a result, there was a substantial decrease in cash flows available to the Group and cash on hand fell from IDR554 billion (USD37.l million) as of December 31, 2019, to approximately IDR 150 billion (USD 10.1 million) as of September 25, 2020.  Id. ¶ 22.

25.     The resulting financial challenges culminated in a liquidity crisis.  Id. ¶ 23. Accordingly, the Debtors were unable to meet their respective payment obligations under the Notes when they became due on August 31, 2020 and October 13, 2020, respectively.  Id.

26.     On July 15, 2020, PT Modernland appointed PT Borrelli Walsh ("Borrelli Walsh") as independent financial advisor, Milbank LLP ("Milbank") as international legal counsel, and Oon & Bazul as Singapore legal counsel, to facilitate a restructuring of the Notes.  Id. ¶ 24.

27.     On September 2, 2020, the Debtors and PT Modernland received a letter from Baker, McKenzie, Wong & Leow stating that they acted on behalf of an ad hoc committee ("Committee") of beneficial holders and/or investment advisors or managers of discretionary accounts for the holders or beneficial owners of over 25% in outstanding principal amount of each of the 2021 Notes and 2024 Notes.  Among other things, such letter referred to JGC Ventures' default in the payment of interest on the 2021 Notes on August 31, 2020, and stated that the Committee would be supportive of efforts to protect and preserve value for all stakeholders and to return the Group to financial stability.  Id. ¶ 25.

28.     On September 29, 2020, JGC Ventures filed for a moratorium under Section 64 of the IRDA in case number HC/OS 959/2020 before the Singapore Court.  PT Modernland and MDLN Holdings (in connection with their roles as providers of the collateral securing the 2021

Notes and other obligations under the 2021 Notes) filed for moratoria under Section 65 of the IRDA in case numbers HC/OS 960/2020 and HC/OS 962/2020, respectively, before the Singapore Court to secure time to propose the 2021 Notes Scheme and prevent any legal and/or enforcement action from being taken against the relevant applicants and the collateral securing the 2021 Notes. These moratoria applications were granted by the Singapore Court on October 29, 2020. Id. ¶ 26.

29.     On November 24, 2020, Modernland Overseas filed for a moratorium under Section 64 of the IRDA in case number HC/OS 1192/2020 before the Singapore Court. PT Modernland and MLand (in connection with their roles as providers of the collateral securing the 2024 Notes and other obligations under the 2024 Notes) filed for moratoria under Section 65 of the IRDA in case numbers HC/OS 1187/2020 and HC/OS 1191/2020, respectively, before the Singapore Court to secure time to propose the Scheme with respect to the 2024 Notes and prevent any legal and/or enforcement action from being taken against the relevant applicants and the collateral securing the 2024 Notes. These moratoria applications were granted by the Singapore Court on January 12, 2021. Id. ¶ 27.

## IV.     Description of the Schemes[2]

30.     The scheme documents containing an explanation of the terms of the Schemes and additional background with respect to the Debtors and the Singapore Proceedings (the "Explanatory Statements") are attached as Exhibits B and C to the Foreign Law Expert Declaration.

31.     In summary, the Schemes are being proposed in order to implement the following amendments to the Notes ("Notes Amendments"):

---

[2]     The below is a high-level summary only, and is qualified in its entirety by the full terms of the Schemes.

(a)     the extension of the maturity of the 2021 Notes from August 30, 2021 to June 30, 2025, and the maturity of the 2024 Notes from April 13, 2024 to April 30, 2027;

(b)     a decrease in interest payable in respect of the Notes as follows:

| 12-month period beginning on the Restructuring Effective Date or the relevant anniversary of the Restructuring Effective Date for each of the following years: | Amended 2024 Notes | | | Amended 2021 Notes | | |
|---|---|---|---|---|---|---|
| | Coupon | | Total | Coupon | | Total |
| | Cash | PIK | | Cash | PIK | |
| 2021 | 0.0% | 3.0% | **3.0%** | 0.0% | 3.0% | **3.0%** |
| 2022 | 1.0% | 3.0% | **4.0%** | 1.0% | 3.0% | **4.0%** |
| 2023 | 2.0% | 3.0% | **5.0%** | 2.0% | 3.0% | **5.0%** |
| 2024 - Maturity | 3.0% | 3.0% | **6.0%** | 3.0% | 3.0% | **6.0%** |

(c)     the amendment of the covenants contained in the Notes Indentures to allow additional working capital loans of up to IDR500 billion by PT Modernland; and

(d)     additional amendments to covenants as set out in the Explanatory Statements dated June 25, 2021.

Id. ¶ 29.

32.     The Notes Amendments do not directly result in additional liquidity being provided (although they will allow part of the applicable coupon to accrue as PIK rather than being entirely cash pay).  The restructuring under the Schemes is also conditional on an order from this Court recognizing the Singapore Proceedings as foreign proceedings and granting the relief sought herein.  Id. ¶ 30.

33.     The Notes Amendments will have the effect of enjoining the Scheme Creditors from taking any action contrary to the Notes Amendments against the Debtors, as well as against the other obligors on the Notes, party to the Notes Indentures, such as PT Modernland and certain

subsidiaries that are Notes guarantors (collectively, the "Obligors"). Id. ¶ 31. The Scheme also provides for the waiver and release by Scheme Creditors of all liabilities against Release Deed Beneficiaries[3] arising out of, relating to, and in respect of the preparation, conduct, sanctioning, implementation, and execution of the Scheme or any Restructuring Documents (as defined in the Explanatory Statements). In particular, the Released Parties[4] and Administrative Parties[5] are released from claims arising out of, relating to, and in respect of any breach or default under the Notes. Id.

34.     The Debtors believe that the extensions of the maturity of the Notes provided by the Notes Amendments will provide the Group with the time it will need to normalize its business following the impact of the pandemic. Id. ¶ 32.

## V.     The Singapore Proceedings and the Moratoria Applications

### A.     Moratoria Applications Generally

35.     Section 64 of the IRDA allows a company proposing, or intending to propose, a scheme of arrangement (a "Restructuring Plan") to its creditors or any class of its creditors to obtain moratorium protection in a reorganization proceeding supervised by the Singapore Court (the "Moratorium Application"), much like a Chapter 11 case under the Bankruptcy Code. Foreign Law Expert Declaration ¶ 6. A copy of the IRDA is attached as Exhibit A to the Foreign Law Expert Declaration.

---

[3]   As defined in the Explanatory Statements, the Release Deed Beneficiaries are "(a) the Released Parties; (b) each Committee Party and their respective agents, advisors, representatives, directors, officers and employees; and each (c) Administrative Party and their respective agents, advisors, representatives, directors, officers and employees, and "Release Deed Beneficiary" shall mean any one of them."

[4]   As defined in the Explanatory Statements, the Released Parties are "(a) the Company, the Guarantors, the Security Providers and their respective affiliates; (b) the Advisors and the Chairman; (c) each agent, advisor, representative, director, officer and employee of each of the parties set out in (a) and (b) above; and (d) each predecessor, successor and assign of each of the parties set out in (a), (b) and (c) above[.]"

[5]   As defined in the Explanatory Statements, the Administrative Parties are "(a) the [ ] Notes Trustee, [ ] Notes Agents, and [ ] Notes Depository," or their replacements, for the Existing and Amended Notes.

36.     A Moratorium Application pursuant to the IRDA may be commenced by a company if the company makes, or undertakes to the Singapore Court to make, as soon as practicable, an application under (i) Section 210 of the Companies Act (Chapter 50, Singapore) (the "Singapore Companies Act") for the Singapore Court to order a meeting of the creditors or class of creditors in relation to the Restructuring Plan or (ii) Section 71 of the IRDA to approve the Restructuring Plan.  If the company has not proposed a Restructuring Plan, the company will be required to provide a brief description of the intended compromise or arrangement, containing sufficient particulars to enable the Singapore Court to assess whether the intended compromise or arrangement is feasible and merits consideration by the company's creditors.  Id. ¶ 7.

37.     Upon filing a Moratorium Application, an automatic moratorium against any creditor's enforcement action comes into place for a period starting on the date on which the application is made and ending on the earlier of (i) the date that is 30 days after the date on which the application is made or (ii) the date on which the application is decided by the Singapore Court (the "Automatic Moratorium Period").  Id. ¶ 8.

38.     During the Automatic Moratorium Period, any creditor of the company may intervene and seek relief from the Singapore Court in relation to the commencement of the Singapore proceeding and the automatic moratorium.  Id. ¶ 9.

39.     The Singapore Court will generally hold a hearing and decide whether or not to approve the Moratorium Application prior to the expiration of the Automatic Moratorium Period. In the event the Singapore Court approves the Moratorium Application, the Singapore Court may determine the period of time in which the moratorium will be in place for (the "Moratorium Period").  Id. ¶ 10.  The intent of the Moratorium Period is to provide the company with the time

and space to complete the Restructuring Plan and make an application for the Singapore Court's

approval and sanction of the Restructuring Plan.  Id.

40.    The above is a debtor-in-possession process, meaning that the management of the

company remains in control of the company during the Moratorium Period.  However, the

company will be subject to the supervision of the Singapore Court during the Moratorium Period.

During the Moratorium Period:

(a)    the Singapore Court will generally require the company to submit to the Singapore Court periodic updates on the company's financial affairs, including a report on the valuation of each of the company's significant assets, any information relating to the acquisition, disposal, or grant of any security by the company, periodic financial reports of the company and the company's subsidiaries, and forecasts of the profitability and the cash flow from the operations of the company and the company's subsidiaries;

(b)    the Singapore Court may, upon request by the company, approve the granting of super priority rescue financing, much like a debtor-in-possession financing in a Chapter 11 case;

(c)    the Singapore Court may, upon request by a creditor, make an order restraining the company from disposing its property other than in good faith and in the ordinary course of the company;

(d)    the Singapore Court may, upon request by a creditor, make an order restraining the company from transferring any share in, or altering the rights of any member of, the company; and

(e)    the Singapore Court may, upon request by a creditor, terminate the Moratorium Period.

Id. ¶ 11.

41.    A Restructuring Plan may be proposed by the company during the Moratorium

Period pursuant to Section 210 of the Singapore Companies Act.  Under Section 210 of the

Singapore Companies Act, the process of implementing a scheme of arrangement to compromise

the debts of creditors consists of three main stages: (1) making an application to the Singapore

Court for an order that one or more meetings of creditors be summoned to consider and, if thought

to be fit, approve the Restructuring Plan; (2) putting the Restructuring Plan before participants at these meetings and obtaining approval by three-fourths in value and a majority in number of the creditors who are present and voting at the meeting; and (3) if and only if the Restructuring Plan is approved by creditors, the Singapore Court may, in its discretion, sanction the Restructuring Plan having regard to the fairness and reasonableness of the scheme of arrangement.  Id. ¶ 12.

42.    Alternatively, a Restructuring Plan may be proposed by the company during the Moratorium Period pursuant to Section 71 of the IRDA.  Under Section 71 of the IRDA, the Singapore Court may approve a Restructuring Plan if the Singapore Court is satisfied that the Restructuring Plan would have been approved had a meeting of the creditors been summoned pursuant to Section 210 of the Singapore Companies Act.  Section 71 of the IRDA is inspired by prepackaged chapter 11 cases, and the Singapore Court has generally referred to the practices of the United States Bankruptcy Court for the Southern District of New York in cases involving applications under Section 71 of the IRDA.  Id. ¶ 13.

43.    In the event the company is not able to propose and obtain the sanction of the Singapore Court of the Restructuring Plan during the Moratorium Period, the company may make an application to the Singapore Court for an extension of the Moratorium Period.  There is no fixed time period and the length of the Moratorium Period and any subsequent extension(s) are subject to the discretion of the Singapore Court.  Id. ¶ 14.

B.    **The Debtors' Singapore Proceedings**

i.    **The Singapore Applications**

44.    On September 29, 2020 and November 24, 2020, respectively, JGC Ventures and Modernland Overseas filed for moratoriums with the Singapore Court pursuant to Section 64 of the IRDA (the "Singapore Applications"), in each case to secure time to propose the Schemes and prevent any legal and/or enforcement action from being taken against them and the collateral

18

securing the Notes.  Id. ¶ 15.  The Singapore Applications are registered under case nos. HC/OS 959/2020 and HC/OS 1192/2020, respectively.  Id.

45.     The respective Automatic Moratorium Periods commenced on the dates of the Singapore Applications, being September 29, 2020 and November 24, 2020, respectively, and ended on October 29, 2020 and January 12, 2021, respectively.  Id. ¶ 16.

### ii.     The Moratorium Periods

46.     On October 29, 2020 and January 12, 2021, respectively, the Singapore Court issued orders  (the "Singapore Orders") granting the respective Singapore Applications.  The Singapore Orders provided for Moratorium Periods ending on February 28, 2021.  Foreign Representative Declaration ¶ 35.

47.     During the Moratorium Periods, the Debtors sought to engage the holders of the Notes (the "Holders") in discussions on proposed schemes of arrangement in respect of the Notes. Notifications were sent to the Holders through each of Euroclear Bank SA/NV and Clearstream Banking S.A. (the "Clearing Systems"), a website maintained by the Singapore Exchange ("SGXNet"), and the Scheme Website.[6]  Id. ¶ 36.

48.     Borrelli Walsh prepared a comprehensive restructuring proposal dated December 2, 2020 (the "Restructuring Proposal").  The Restructuring Proposal was provided to only those Holders and/or their advisors who entered into non-disclosure agreements with the Group.  Id. ¶ 37.

49.     On December 2, 2020, Borrelli Walsh sent to the known Holders a redacted version of the Restructuring Proposal (the "Proposed Terms"), which contained key information under the

---

[6]     https://deals.lucid-is.com/modernland/.

Restructuring Proposal, to the extent such information was already public and/or would be made publicly available as part of the Explanatory Statements issued on June 25, 2021.  Id. ¶ 38.

50.     Since December 2020, Borrelli Walsh has been engaging with the Holders in connection with the Restructuring Proposal and the Proposed Terms.  On December 16, 2020, the Debtors and Borrelli Walsh held a videoconference for the Holders to discuss the Proposed Terms and to address any questions that the Holders may have.  On December 15, 2020, Borrelli Walsh organized a site visit and diligence session in Jakarta to provide another forum and opportunity for interaction and discussions between the Holders, PT Modernland, and their respective advisors. Id. ¶ 39.

### iii.     The First Extension of the Moratoria

51.     Discussions, exchanges, and counter-proposals among the parties in relation to the Restructuring Proposal and the Proposed Terms continued to take place into 2021.  Id. ¶ 40.

52.     By February 2021, negotiations had advanced significantly since the start of the Moratoria Periods.  However, it was clear that extensions of the moratoria would be required to complete negotiations. Thus, on February 16, 2021, the Debtors filed for extensions of the moratoria by three months, until May 31, 2021.  These applications were granted by the Singapore Court on March 1, 2021.  Id. ¶ 41.

53.     On May 5, 2021, Borrelli Walsh circulated, for the review of the known Holders, a term sheet (the "Draft Term Sheet") representing a near-final restructuring proposal in respect of the Notes (setting out further compromises on the part of the respective Debtors taking into account input from the Holders) and invited such Holders to a conference call on May 7, 2021 to discuss the Draft Term Sheet.  Id. ¶ 42.

### iv.    The Second Extension of the Moratoria

54.    On May 24, 2021, the Debtors filed for further extensions of the moratoria by three months, until August 31, 2021.  These applications were granted by the Singapore Court on June 30, 2021.  Id. ¶ 43.

55.    On June 8, 2021, Borrelli Walsh circulated, for the review of the known Holders, further revisions to the Draft Term Sheet and invited such Holders to a conference call on June 10, 2021, to discuss the same.  By this time, the Debtors had received informal and non-binding indications of support from the Committee and a substantial number of other Holders in respect of this version of the Draft Term Sheet and were proceeding to finalize the transaction documents in respect of the Schemes.  Id. ¶ 44.

56.    On June 25, 2021, the Scheme Creditors were provided notice of the proposed schemes of arrangement through the Scheme Website, the Clearing Systems, and SGXNet.  The Debtors also issued Explanatory Statements on June 25, 2021 containing additional information about the Debtors and the Schemes, including dates for the information meetings and sanction hearings and all relevant deadlines.  Id. ¶ 45.

57.    The information meeting was held on July 2, 2021.  Id. ¶ 46.

### v.    The Sanction Orders

58.    In the Singapore Proceedings, the Debtors presented to the Singapore Court an arrangement for the restructuring of substantially all of their indebtedness pursuant to section 71 of the IRDA that would allow the Debtors to avoid liquidation and maximize value for all stakeholders in an equitable manner.  Id. ¶ 49.

59.    On July 9, 2021, the Schemes were approved by the requisite majorities of the Scheme Creditors prescribed under Singapore law and in accordance with the terms of the

Schemes.[7]  The voting results were announced on July 12, 2021.  With respect to the JGC Ventures Scheme, 100% of the Scheme Creditors who voted did so in favor of the Scheme, representing 100% of the total number and amount of voting Scheme Creditors and voted claims, respectively. With respect to the Modernland Overseas Scheme, 97.78% of the Scheme Creditors who voted did so in favor of the Scheme, representing 97.78% of the total number and 99.52% in amount of voting Scheme Creditors and voted claims, respectively.  Id. ¶ 50.

60.     At the Sanction Hearing on August 30, 2021, any Scheme Creditor or other interested party who wished to raise an objection to the Schemes had the opportunity to object and be heard prior to the Singapore Court's decision on whether or not to sanction (approve) the Schemes. No such objections were raised at the Sanction Hearing.  Id. ¶ 51.

61.     The Schemes were Sanctioned by the orders of the Singapore Court (the "Sanction Orders") on August 30, 2021.  Id. ¶ 52.

### vi.     Foreign Representative

62.     Mr. William Honoris, director for each of the Debtors, was selected and appointed by the boards of directors for each of the Debtors as the Foreign Representative for the Debtors in connection with these Chapter 15 Cases.  Id. ¶ 47.

63.     The authority given to Mr. Honoris to act as the Debtors' Foreign Representative in these Chapter 15 Cases has been acknowledged and approved by the Singapore Court pursuant to the Sanction Orders, each of which appointed Mr. Honoris as the Debtors' Foreign Representative.  Id. ¶ 48.

---

[7]     The votes cast in favor of the Schemes by the members of the Committee were premised on the Debtors' and PT Modernland's agreement to certain requests made by the Committee pertaining to the implementation of the Schemes, which agreement was executed by the Debtors, PT Modernland, and the members of the Committee and dated August 30, 2021.

## VI.    The Chapter 15 Cases

64.    On the date hereof, the Foreign Representative filed, on behalf of each Debtor, (i) an Official Form 410 and (ii) statements and lists pursuant to section 1515(c) of the Bankruptcy Code and pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(4) and 7007.1 and Local Rule 1007-3, all of which are incorporated herein by reference.  Id. ¶ 53.

### **Basis for Relief**

## I.    **The Singapore Proceedings are Entitled to Recognition Pursuant to Section 1517 of the Bankruptcy Code as Foreign Main Proceedings, or in the Alternative as Foreign Nonmain Proceedings.**

65.    Section 1517 of the Bankruptcy Code provides clear and objective standards that must be satisfied for recognition of a foreign proceeding in the United States.  Specifically, section 1517 provides, in pertinent part, that "after notice and a hearing, an order recognizing a foreign proceeding shall be entered if – (1) such foreign proceeding . . . is a foreign main or foreign nonmain proceeding . . . ; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515."  11 U.S.C. § 1517(a)(1)-(3).  As more fully discussed below, the Singapore Proceedings satisfy these standards and should be recognized as foreign main proceedings or, alternatively, as foreign nonmain proceedings.

### A.    **The Debtors are Each Eligible to be a Debtor Under the Bankruptcy Code.**

66.    As a threshold issue, each Debtor is eligible to be a debtor under the Bankruptcy Code.  Section 109(a) of the Bankruptcy Code provides, in relevant part, that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."  11 U.S.C. § 109(a).  Courts in this District have applied section 109(a) to chapter 15 eligibility.  See, e.g., Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet), 737 F.3d 238, 247 (2d Cir. 2013).

67.     Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors have held that a debtor satisfies the section 109(a) requirement even when it only has a nominal amount of property in the United States.  See, e.g., In re B.C.I. Fins. Pty Ltd., 583 B.R. 288, 290 (Bankr. S.D.N.Y. 2018) ("As a general matter, courts that have construed the 'property' requirement in Section 109 'with respect to foreign corporations and individuals have found the eligibility requirement satisfied by even a minimal amount of property located in the United States.'").

68.     Here, each Debtor is eligible to be a debtor under section 109(a) because it has property interests in the United States.  First, each has an interest in funds deposited with Milbank as a retainer for its services, which funds are held in New York, New York.  Foreign Representative Declaration ¶ 53.  See, e.g., In re Octaviar Administration Pty Ltd, 511 B.R. 372–73 (Bankr. S.D.N.Y. 2014) (acknowledging that "prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States") (citing In re Cenargo Int'l PLC, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)).  See also In re Foreign Economic Industrial Bank Ltd, "Vneshprombank", 607 B.R. 160, 166, 171-172 (Bankr. S.D.N.Y. 2019) (holding that retainer account was sufficient to satisfy section 109(a) requirement); In re Poymanov, 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017) (same); In re Ocean Rig UDW Inc., 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017), aff'd, 585 B.R. 31 (S.D.N.Y. 2018) (same); In re U.S. Steel Canada Inc., 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017) (granting recognition of a case where the foreign representative cited the presence of a retainer in New York).

69.     Additionally, the Debtors are parties to the 2021 Indenture and 2024 Indenture, each of which is governed by New York law, and, under each of these indentures, the Debtors consented to jurisdiction in New York courts in connection with any suit, action, or proceeding

arising out of or relating to the Notes.    Foreign Representative Declaration ¶¶ 8, 10, 54. Agreements containing jurisdiction provisions of this type have been found to give rise to property rights supporting debtor eligibility under section 109(a) of the Bankruptcy Code.  See, e.g., In re P.T. Bakrie Telecom TBK, 601 B.R. 702, 714-715 (Bankr. S.D.N.Y. 2019) (finding that retainer account and rights under an indenture with New York choice of law and choice of forum provisions satisfy section 109(a)); In re Avanti Commc'ns, 582 B.R. 603, 610–611 (Bankr. S.D.N.Y. 2018) (holding that a foreign debtor was eligible to be a debtor under section 109(a) because of intangible contract rights under a New York law-governed indenture); In re Cell C Proprietary, 571 B.R. 542, 552 (Bankr. S.D.N.Y. 2017) (holding that funds in a retainer account and rights under New York law-governed notes satisfy section 109(a)); In re Berau Capital Res. Pte Ltd, 540 B.R. 80, 83-84 (Bankr. S.D.N.Y. 2015) (same).

70.    Accordingly, each Debtor meets the eligibility requirements of section 109(a) of the Bankruptcy Code.

**B.    The Singapore Proceedings are "Foreign Proceedings."**

71.    The Singapore Proceedings are "foreign proceedings" for the purposes of Chapter 15 of the Bankruptcy Code.  Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).  Based on this definition, courts have held that a "foreign proceeding" is one:

(a)    in which acts and formalities are set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;

(b)    that has either a judicial or an administrative character;

(c)     that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

(d)     that is located in a foreign country;

(e)     that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

(f)     in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

(g)     that is for the purpose of reorganization or liquidation. See Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.), 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing In re Betcorp Ltd., 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); see also In re Oversight & Control Comm 'n of Avanzit, S.A., 385 B.R. 525 (Bankr. S.D.N.Y. 2008) (discussing factors).

72.     The Singapore Proceedings are proceedings commenced pursuant to Section 71 of the IRDA, a Singapore law relating to insolvency or adjustment of debt in which the assets and affairs of the Debtors are subject to control or supervision by a foreign court for the purpose of reorganization or liquidation.   For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." Betcorp, 400 B.R. at 278.  Moreover, a reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers." In re ABC Learning Ctrs. Ltd., 445 B.R. 318, 328 (Bankr. D. Del. 2010).  Because the Singapore Proceedings operate under such statutory framework, they satisfy the first and second factors.

73.     Further, the Singapore Proceedings are collective in nature in that all affected creditors are allowed to participate, and the Singapore Proceedings subject the Debtors' assets and affairs to the supervision of the Singapore Court during the pendency of the proceedings.  Foreign Law Expert Declaration ¶ 11.  The objective of the Singapore Proceedings is to effect a financial

restructuring of the Debtors, and the Debtors have presented to the Singapore Court an arrangement with their Scheme Creditors pursuant to Section 71 of the IRDA. Id. ¶¶ 10, 31.

74.    For these reasons, the Foreign Representative submits that the Debtors commenced the Singapore Proceedings for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.

75.    Courts in this District and elsewhere have recognized proceedings commenced under Section 210 of the Companies Act, which is a predecessor to Section 71 of the IRDA, pursuant to which the Singapore Proceedings have been commenced, as well as under Section 64 of the IRDA. See In re PT Sri Rejeki Isman TBK, Case No. 21-11072 (JLG) [Dkt. No. 22] (Bankr. S.D.N.Y. July 23, 2021); In re Blue Ocean Resources Pte. Ltd., Case No. 18-22806 (RDD) [Dkt. No. 19] (Bankr. S.D.N.Y. July 9, 2018); In re Berau Capital Resources Pte Ltd (In re Berau), 540 B.R. 80, 82-84 [Dkt No. 34] (Bankr. S.D.N.Y. Oct. 28, 2015); In re Bumi Investment Pte Ltd, Case No. 14-13296 (REG) [Dkt No. 23] (Bankr. S.D.N.Y. Jan. 21, 2015); In re Armada (Singapore) Pte. Ltd., Case No. No. 09-10105 (JMP) [Dkt No. 45] (Bankr. S.D.N.Y. July 22, 2009).

76.    Accordingly, the Foreign Representative respectfully requests that the Court finds that each Singapore Proceeding is a "foreign proceeding."

**C.    The Singapore Proceedings are "Foreign Main Proceedings."**

77.    The Foreign Representative respectfully submits that the Singapore Proceedings are "foreign main proceedings," as defined in section 1502(4) of the Bankruptcy Code. The Bankruptcy Code provides that a foreign proceeding is a "foreign main proceeding" if it is pending in the country where the debtor has the center of its main interests. 11 U.S.C. § 1517(b)(1).

78.    Section 1516(c) of the Bankruptcy Code contains a presumption that, absent evidence to the contrary, a debtor's registered office is the center of its main interests. See 11 U.S.C. § 1516(c); see also In re Bear Stearns, 374 B.R. 122, 127 (Bankr. S.D.N.Y 2007), aff'd,

389 B.R. 325 (S.D.N.Y. 2008).  Here, the Debtors are formed under the laws of Singapore and

each of their registered offices is at 1 Marina Boulevard, #28-00, Singapore 018989.  Foreign

Representative Declaration ¶ 5.  Therefore, absent evidence to the contrary, each Debtor's center

of main interests is presumed to be in Singapore.  No such contrary evidence exists.

79.     Indeed, the analysis of a foreign debtor's center of main interests is a flexible one,

as "courts do not apply any rigid formula or consistently find one factor dispositive."  Betcorp,

400 B.R. at 290.  Among other factors that may be weighed in considering a debtor's center of

main interests are "the location of the debtor's headquarters; the location of those who actually

manage the debtor (which, conceivably could be the headquarters of a holding company); the

location of the debtor's primary assets; the location of the majority of the debtor's creditors or of

a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law

would apply to most disputes."  In re Bear Stearns, 374 B.R. at 128 (citing In re SPhinX, Ltd., 351

B.R. 103, 117 (Bankr. S.D.N.Y. 2006), aff'd, 371 B.R. 10 (S.D.N.Y. 2007)).  Courts also take into

consideration the expectations of creditors and other interested parties, as the company's center of

main interest must be "ascertainable to third parties."  See Morning Mist Holdings Ltd. v. Krys (In

re Fairfield Sentry Ltd.), 714 F.3d 127, 136-38 (2d Cir. 2013); In re Millennium Global Emerging

Credit Master Fund Ltd., 474 B.R. 88, 93 (S.D.N.Y. 2012).

80.     Consideration of these additional factors supports the conclusion that the Debtors'

center of main interests is in Singapore.  Each of the Debtors is organized under the laws of

Singapore and the Debtors' mail is received at the Debtors' Singapore address.  Foreign

Representative Declaration ¶ 5.  The registered addresses of the Debtors' directors are in

Singapore, and one of their two directors also resides in Singapore.  Id.  JGC Ventures maintains

a bank account in Singapore, as did Modernland Overseas until last year.  All of the Debtors'

statutory books and records are kept at their registered address in Singapore, including (i) registers

of directors, members, and charges and (ii) copies of board minutes and minutes of annual general

meetings.  Id.  Singapore clearly is "ascertainable by third parties" as the Debtors' center of main

interests.

81.     The Committee of noteholders (holding over 25% of the outstanding principal

amount of the Notes) is managed by Singapore incorporated entities, (i) Blackrock (Singapore)

Ltd., (ii) Eastspring Investments (Singapore) Ltd., and (iii) Lombard Odier (Singapore) Ltd.

82.     Further, as described above, both Debtors are special purpose vehicles through

which the Group has raised funds for and on behalf of the Group through the issuance of the Notes

that are listed on the Singapore Exchange.  Thus, the business and operations of the Debtors are

all located in Singapore.

83.     For the foregoing reasons, the Foreign Representative respectfully submits that the

Court should grant recognition of the Singapore Proceedings as  "foreign main proceedings," as

defined in section 1502(4) of the Bankruptcy Code.

**D.      In the Alternative, The Singapore Proceedings are "Foreign Nonmain
Proceedings."**

84.     Should the Court determine that the Singapore Proceedings are not foreign main

proceedings of the Debtors, the Singapore Proceedings should be recognized as foreign nonmain

proceedings pursuant to section 1517(b)(2) of the Bankruptcy Code, which provides that "[a]

foreign proceeding shall be recognized . . . as a foreign nonmain proceeding if the debtor has an

establishment within the meaning of section 1502 in the foreign country where the proceeding is

pending."

85.     Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of

operations where the debtor carries out nontransitory economic activity."  11 U.S.C. § 1502(2).

The legislative history of chapter 15 suggests that an "establishment" represents the bare minimum presence that a debtor must demonstrate in the applicable jurisdiction to obtain chapter 15 recognition of a foreign proceeding. See H. Rep. 109-31, Pt. 1, 109th Cong., 1st Sess. 107 (2005) ("In order to be recognized as a foreign nonmain proceeding, the debtor must at least have an establishment in that foreign country.").

86.     To satisfy this definition, a debtor must have a "seat for local business activity" in the foreign country and this activity must have a "local effect on the marketplace." In re Mood Media Corp., 569 B.R. 556, 561 (Bankr. S.D.N.Y. 2017).   Thus, courts have recognized establishments in jurisdictions in which debtors conducted limited business activities and maintained certain records and where members of its board of directors were located. See In re Millennium Glob. Emerging Credit Master Fund Ltd., 458 B.R. 63, 85 (Bankr. S.D.N.Y. 2011), aff'd, 474 B.R. 88 (S.D.N.Y. 2012); see also In re British Am. Ins. Co. Ltd., 425 B.R. 884, 915-16 (Bankr. S.D. Fla. 2010).   Courts also consider the following factors that "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence."   In re Millennium Glob. Emerging Credit Master Fund Ltd., 458 B.R. at 85.

87.     In this case, even if the Court were to find that Singapore is not the center of main interest for the Debtors, the Court should still find that each Debtor has an establishment in Singapore for purposes of chapter 15 recognition.   The Petitioner submits that the foregoing evidence in support of finding that the center of main interests of each of the Debtors is in Singapore also provides sufficient evidence that each of the Debtors maintains an establishment in that jurisdiction.

### E.      The Petitioner is a "Foreign Representative."

88.      Section 101(24) of the Bankruptcy Code provides that:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

89.      Here, the Petitioner is a person who has been authorized by the Singapore Court, pursuant to the Sanction Orders, to act as the Foreign Representative for each Debtor in connection with the Chapter 15 Cases.  See Foreign Representative Declaration ¶ 48.

90.      Further, the Petitioner has been authorized and empowered by each Debtors' boards of directors to act as the Foreign Representative in the  Chapter 15 Cases. Id. ¶ 47.  Copies of the resolutions of the Debtors' boards of directors are attached to the Official Form 401 Petitions. Accordingly, the Petitioner is the duly authorized Foreign Representative of the Debtors within the meaning of section 101(24) of the Bankruptcy Code.

### F.      The Foreign Representative Properly Commenced the Chapter 15 Cases.

91.      These Chapter 15 Cases were duly and properly commenced, as required by section 1504 of the Bankruptcy Code, by filing a Chapter 15 Petition for each Debtor pursuant to section 1515(a) of the Bankruptcy Code.  Pursuant to section 1515(b) of the Bankruptcy Code, a petition for recognition of a foreign proceeding must be accompanied by one of the following:

(1)      certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2)      a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3)      in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

92.    True and correct copies of the resolutions of each Debtor's board appointing the

Petitioner as the Foreign Representative are attached to the Foreign Representative Declaration as

Exhibits A and B.   In addition, the Sanction Orders also appoint the Petitioner as the foreign

representative.    Copies of the Sanction Orders are attached to the Foreign Representative

Declaration as Exhibits C and D thereto.

93.    The Petition Forms were accompanied by all fees, documents, and information

required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), including:  (a) a certified copy of the Sanction Orders; (b) lists pursuant to Bankruptcy

Rule 1007(a)(4)(B) containing: (i) the names and addresses of all persons or bodies authorized to

administer foreign proceedings of the Debtors; (ii) all entities against whom provisional relief is

being sought under section 1519 of the Bankruptcy Code; and (iii) all parties to litigation pending

in the United States to which the Debtors are a party as of the date the Chapter 15 Petitions was

filed; (c) a corporate ownership statement containing the information described in Bankruptcy

Rule 7007.1; and (d) a statement identifying all foreign proceedings with respect to the Debtors

that are known to the Foreign Representative.

94.    Because this Court is entitled to presume the authenticity of all the foregoing

documents under section 1516(b) of the Bankruptcy Code, the requirements of section 1515 of the

Bankruptcy Code have been satisfied.

## II.    The Debtors May Be Entitled to Certain Relief Automatically Under 11 U.S.C. § 1520.

95.    Section 1520(a) of the Bankruptcy Code sets forth certain protections that

automatically result from the recognition of a foreign proceeding as a foreign main proceeding,

see 11 U.S.C. § 1520(a), including the application of the automatic stay under section 362(a) of

the Bankruptcy Code to a debtor and its property within the territorial jurisdiction of the United

States.   Thus, to the extent the Court recognizes the Singapore Proceedings as foreign main

proceedings, the section 1520(a) protections should be automatically applicable to the Debtors and their property within the territorial jurisdiction of the United States without any further showing.

### III.   Enforcement of the Schemes and the Sanction Orders and Other Discretionary Relief Is Warranted.

96.     The Foreign Representative respectfully requests that the Schemes and the Sanction Orders be enforced in the United States.

97.     Among other forms of discretionary relief, United States bankruptcy courts have routinely held that comity may require enforcing the equivalents of a reorganization plan and a confirmation order under sections 1521 and 1507 of the Bankruptcy Code. See, e.g., In re Avanti Commc'ns, 582 B.R. 603, 616 (Bankr. S.D.N.Y. 2018) ("Cases have held that in the exercise of comity that appropriate relief under section 1521 or additional assistance under section 1507 may include recognizing and enforcing a foreign plan confirmation order.") (citing In re U.S. Steel Canada Inc., 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017)); In re Cell C Proprietary Ltd., 571 B.R. 542, 554 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing the order of the South African Court sanctioning a scheme of arrangement); In re Rede Energia S.A., 515 B.R. 69 (Bankr. S.D.N.Y. 2014) (enforcing Brazilian reorganization plan and enjoining acts in contravention thereof); In re Mercantile & General Reinsurance Co. Ltd, Case No. 05-14076 (BRL) [Dkt. No. 16] (Bankr. S.D.N.Y. Sept. 7, 2005) (granting recognition to scheme of arrangement sanctioned in Scottish high court and entering permanent injunction in support of such scheme); The Argo Fund Ltd. V. Bd. of Dirs. of Telecom Arg., S.A., as Foreign Rep. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.), 528 F.3d 162, 174-75 (2d Cir. 2008) (concluding that the bankruptcy court did not abuse its discretion in granting full force and effect to Argentine plan and approval order in the United States); In re Ocean Rig UDW Inc., 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017), aff'd, 585 B.R. 31 (S.D.N.Y. 2018) (recognizing and enforcing Cayman schemes and orders of

Cayman court sanctioning same); <u>In re Boart Longyear Ltd.</u>, Case No. 17-11156 (MEW) [Dkt.

No. 45] (Bankr. S.D.N.Y. Aug. 30, 2017) (recognizing and enforcing order of Supreme Court of

New South Wales sanctioning Australian schemes of arrangement); <u>In re Mood Media Corp.</u>, Case

No. 17-11413 (MEW) [Dkt. No. 44] (Bankr. S.D.N.Y. June 28, 2017) (recognizing and enforcing

Canadian plan of arrangement and Canadian court order approving same); <u>In re Pac. Expl. & Prod.

Corp.</u>, Case No. 16-11189 (JLG) [Dkt. No. 31] (Bankr. S.D.N.Y. Oct. 3, 2016) (same); <u>In re Kaisa

Grp. Holdings Ltd.</u>, Case No. 16-11303 (SHL) [Dkt. No. 22] (Bankr. S.D.N.Y. July 14, 2016)

(recognizing and enforcing Hong Kong scheme and Hong Kong scheme sanction order).

      98.    Moreover, United States bankruptcy courts (including courts in this District) have

enforced and given full force and effect to foreign schemes of arrangement that included

modification of the rights of scheme creditors against non-debtors. <u>See, e.g.</u>, <u>In re Ballantyne Re

plc</u>, 19-11490-JLG (Bankr. S.D.N.Y. June 12, 2019) [Dkt. No. 28] (enforcing English scheme of

arrangement releasing, among other entities, non-debtor insurers and advisors); <u>In re Agrokor

D.D.</u>, 591 B.R. 163 (Bankr. S.D.N.Y. 2018) (enforcing third-party release granted in foreign main

proceeding); <u>Avanti</u>, 582 B.R. at 615 (enforcing UK scheme of arrangement containing release of

non-debtor subsidiary guarantors); <u>In re Codere Finance (UK) Ltd.</u>, Case No. 15-13017-JLG

(Bankr. S.D.N.Y. 2015) [Dkt.No. 16] (enforcing UK scheme of arrangement releasing, among

others, a non-debtor co-issuer of the debtor's notes and non-debtor guarantors of the same); <u>In re

Towergate Fin. plc</u>, Case No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015) [Dkt. No. 16];

(enforcing UK scheme of arrangement releasing, among other entities, non-debtor affiliates of the

debtor); <u>In re New World Res. N.V.</u>, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014)

[Dkt. No. 20] (enforcing UK scheme of arrangement releasing non-debtor subsidiary guarantors);

<u>In re Magyar Telecom B.V.</u>, Case No. 13-13508-SHL (Bankr. S.D.N.Y. Dec. 11, 2013) [Dkt. No.

26] (enforcing UK scheme of arrangement releasing, among other entities, non-debtor subsidiary guarantors); In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685, 698-99 (Bankr. S.D.N.Y. 2010) (approving a Canadian plan that included releases in favor of counterparties to swap transactions with the debtor); In re Hibu Inc., Case No. 14-70323 (REG) (Bankr. E.D.N.Y. Feb. 27, 2014) [Dkt. No. 29] (recognizing and enforcing UK scheme of arrangement releasing the debtor's lenders).

99.     Singapore courts, including the Singapore Court of Appeal, have long endorsed and explicitly sanctioned the inclusion of third-party releases in restructuring schemes.  See, e.g., Daewoo Singapore Pte Ltd v CEL Tractors Pte Ltd [2001] 2 SLR(R) 791 (finding it "permissible to incorporate in a scheme of arrangement…under [section] 210 of the Companies Act…a term to the effect that…the creditors will release the guarantors from their obligations under the respective guarantee").

100.    Here, application of the Notes Amendments to the Obligors and of the releases to the Release Deed Beneficiaries in the United States is necessary to prevent individual Scheme Creditors from frustrating the purpose of the Schemes.  If any Scheme Creditors could evade the terms of the Schemes by commencing actions in the United States, the Debtors would lose the benefits of the Notes Amendments while allowing certain creditors to obtain more than they are entitled to under the Schemes to the detriment of other Scheme Creditors.  This could jeopardize the Debtors' ability to continue as going concerns.  For these reasons, among others, the completion of the Schemes is conditioned on an order of a United States Bankruptcy Court recognizing the Singapore Schemes as foreign proceedings under chapter 15 and enforcing the Sanctions Orders in the United States.

**A.      The Court May Grant the Requested Relief Pursuant to Section 1521.**

101.    Upon recognition of a foreign proceeding, whether main or nonmain, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the Foreign

Representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets

of the debtor or the interests of the creditors." 11 U.S.C. §§ 1521(a), 1522(a); <u>see also</u> <u>Avanti</u>, 582

B.R. at 612 ("The discretion that is granted is exceedingly broad, since a court may grant any

appropriate relief that would further the purposes of chapter 15 and protect the debtor's assets and

the interests of creditors.") (internal citations omitted). Such relief may include:

(a)     staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(b)     staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(c)     suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(d)     providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(e)     entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(f)     extending relief granted under section 1519(a); and

(g)     granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550 and 724(a).

11 U.S.C. § 1521(a). The Court may grant relief under section 1521(a) if the interests of "the

creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C.

§ 1522(a). Although the Bankruptcy Code does not define "sufficient protection," legislative

history indicates that a foreign court order may be enforced unless "it is shown that the . . .

proceeding is seriously and unjustifiably injuring United States creditors." H. Rep. No. 109-31,

pt. 1, at 116 (2005). Courts have also explained "sufficient protection" as:

> embodying three basic principles: '[(i)] the just treatment of all holders of claims against the bankruptcy estate, [(ii)] the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and [(iii)] the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'

In re ENNIA Caribe Holding N.V., Case No. 18-12908 (MG) 2019 WL 365749, at *5 (Bankr. S.D.N.Y. Jan. 29, 2019) (quoting In re Atlas Shipping, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) (quoting In re Artimm, S.r.L., 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005))).

102.    Here, all creditors are "sufficiently protected" in the Schemes and the Singapore Proceedings generally.  All Scheme Creditors received adequate notice of the Schemes and had an opportunity to vote whether to accept or reject the Schemes.  Foreign Law Expert Declaration ¶¶ 27, 32.  The Schemes are subject to the control and supervision of the Singapore Court. At the Sanction Hearing on August 30, 2021, any Scheme Creditor or other interested party who wished to raise an objection to the Schemes had the opportunity to object and be heard prior to the Singapore Court's decision on whether or not to sanction (approve) the Schemes. No such objections were raised at the Sanction Hearing.  Id. ¶ 33.  All similarly situated Scheme Creditors will be treated similarly, and there is no contention that United States creditors are being subjected to prejudice or inconvenience.  Hence, the Schemes and the Sanction Orders are the product of proceedings (the Singapore Proceedings) in which all creditors were treated fairly and justly.  See, e.g., In re Bd. of Dirs. of Telecom Arg., S.A., 528 F.3d 162, 170 (2d Cir. 2008) ("The 'just treatment' factor is satisfied upon a showing that the applicable law 'provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors.'") (citing In re Treco, 240 F.3d 148, 158 (2d Cir. 2001)); In re Culmer, 25 B.R. 621, 629 (Bankr. S.D.N.Y. 1992).

103.    Finally, the relief requested here clearly furthers the goals and purposes of chapter 15 itself.  See 11 U.S.C. § 1501 (explaining that chapter 15's "objectives" include "cooperation

between (A) courts of the United States . . . and (B) the courts and other competent authorities of

foreign countries"). Enforcement of the Schemes and the Sanction Orders would foster

cooperation between the Singapore Court and the United States courts. By enforcing the terms of

the Schemes in the United States, this Court would be assisting the Singapore Court in the

implementation of the Sanction Orders.

### B. The Court May Grant the Requested Relief Pursuant to Section 1507.

104.    In granting discretionary relief, the Court may also act pursuant to section 1507 to

provide "additional assistance" to a foreign representative under the Bankruptcy Code or other

United States law. 11 U.S.C. § 1507(a). The legislative history of section 1507 states that it

provides authority for "additional relief" beyond that permitted under sections 1519 to 1521.

Section 1507(b) provides that:

> In determining whether to provide additional assistance under this title or
> under other laws of the United States, the court shall consider whether such
> additional assistance, consistent with the principles of comity, will
> reasonably assure—
>
> (a)     just treatment of all holders of claims against or interests in the
> debtor's property;
>
> (b)     protection of claim holders in the United States against prejudice
> and inconvenience in the processing of claims in such foreign proceeding;
>
> (c)     prevention of preferential or fraudulent dispositions of property of
> the debtor;
>
> (d)     distribution of proceeds of the debtor's property substantially in
> accordance with the order prescribed by this title; and
>
> (e)     if appropriate, the provision of an opportunity for a fresh start for
> the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

105.    Courts have held that principles of comity are key to determining whether to grant

additional assistance. See, e.g., In re Metcalfe & Mansfield Alt. Inv., 421 B.R. 685, 696 (Bankr.

S.D.N.Y. 2010) ("Section 1507 directs the court to consider comity in granting additional assistance to the foreign representative."); In re Atlas Shipping, 404 B.R. at 738 (noting that post-recognition relief is "largely discretionary and turns on subjective factors that embody principles of comity") (quoting In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. 325, 333 (S.D.N.Y. 2008)).

106.     As discussed above, the relief requested is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is necessary to the implementation of the Schemes.

107.     As the Second Circuit has recognized, "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713-14 (2d Cir. 1987); see also Cunard S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion."). Over a hundred years ago, the Supreme Court recognized the need to give effect to foreign schemes of arrangement in order to further these goals, reasoning that:

> [u]nless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.

Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 539 (1883).

## C.    Injunctive Relief is Appropriate.

108.    Because relief under section 1521(a)(1), (2), (3), and (6) of the Bankruptcy Code is tantamount to a permanent injunction, the "standards, procedures, and limitations applicable to an injunction apply to [such] relief." 11 U.S.C. § 1521(e).  Courts in this Circuit will not issue a permanent injunction "unless the movant demonstrates both irreparable harm and a likelihood of success on the merits or a sufficiently serious question regarding the merits to make it a fair ground for litigation with the balance of hardship tipping decidedly in its favor." Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 972 (2d Cir. 1989).  "This Court has granted permanent injunctions in several cases to support proper implementation of a scheme of arrangement." In re Olinda Star Ltd., 614 B.R. 28, 48 (Bankr. S.D.N.Y. 2020) (citing cases).

109.    To obtain a permanent injunction, a movant must demonstrate that (i) an injunction is required to avoid irreparable harm and (ii) there is a likelihood of success on the merits. See Clarkson v. Coughlin, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995).  A foreign representative is likely to succeed on the merits if recognition of a foreign proceeding under chapter 15 is appropriate. See In re Petition of Garcia Avila, 296 B.R. 95, 107 (Bankr. S.D.N.Y. 2003) (applying former section 304 of the Bankruptcy Code).  As explained above, the Schemes meet all of the requirements for recognition, satisfying the second prong of the injunction analysis.

110.    With respect to the first prong, irreparable harm to an estate exists where the "equitable and orderly distribution of a debtor's property" is disrupted. Victrix, 825 F.2d at 71314; see also In re Garcia Avila, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum.") (quoting 2 Collier on Bankruptcy ¶ 304.05, at 304-21 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. Rev. 2003)); In re MMG LLC, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local

creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors."); <u>In re Rubin</u>, 160 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) ("[T]here appears to be little dispute regarding the notion that the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury.") (internal quotation marks and citations omitted); <u>In re Brierley</u>, 145 B.R. 151, 168 (Bankr. S.D.N.Y. 1992) ("Harm to the estate exists from the failure to grant injunctive relief in the form of disruption of an orderly determination of claims and the fair distribution of assets in a single case.") (internal quotation marks and citation omitted); <u>In re Lines</u>, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) ("[T]he premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury.").

111.    Courts in this District have thus repeatedly recognized their authority to grant injunctive relief to enforce foreign plans and discharges.  <u>See, e.g.</u>, <u>In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.</u>, 238 B.R. 25 (Bankr. S.D.N.Y. 1999) (extending injunction of Bermuda court to prohibit any creditor from commencing or continuing actions in the United States contrary to the Bermudan plan); <u>Brierley</u>, 145 B.R. at 168-69 (granting permanent injunction prohibiting suits against the foreign debtor, its property or its administrators arising out of claims which could have been asserted prior to the filing of the ancillary petition); <u>see also</u> <u>In re Bd. of Dirs. of Telecom Arg., S.A.</u>, 528 F.3d 162 (2d Cir. 2008) (concluding that bankruptcy court properly exercised discretion in granting full force and effect to an Argentine plan and approval order in the United States); <u>In re Rede Energia S.A.</u>, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) ("The request by the Foreign Representative that the Court . . . enjoin acts in the U.S. in contravention of the [foreign confirmation decision] is relief of a type that courts have previously granted under section 304 of the Bankruptcy Code and other applicable law.") (citing <u>In re Bd. of Dirs. of Telecom Arg., S.A.</u>,

528 F.3d at 174–76); In re Sino-Forest Corp., 501 B.R. 655 (Bankr. S.D.N.Y. 2013) (granting permanent injunctive relief to enforce Canadian plan); In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685 (Bankr. S.D.N.Y. 2010) (same).

112.    As discussed above, an injunction enforcing the terms of the Schemes and the Sanction Orders in the United States is necessary to prevent Scheme Creditors from seeking to obtain judgments in the United States against the Debtors and the Release Deed Beneficiaries to obtain greater recoveries than those to which they are entitled under the Schemes.  Allowing creditors to relitigate issues resolved pursuant to the Schemes and Sanction Orders in the United States would threaten the success of the Schemes and cause irreparable harm to the Debtors.

113.    The granting of the relief requested herein, conversely, would protect the interests not only of the Debtors and the Release Deed Beneficiaries, but also of all Scheme Creditors by promoting the restructuring of the Group's financial obligations, preserving its going concern status, and ensuring that all creditors are treated on a consistent, nondiscriminatory basis in accordance with the terms of the Schemes and Singapore laws.

## IV.    The Relief Requested Herein Is Consistent With the Public Policy of the United States.

114.    Granting the relief requested herein is entirely consistent with the public policy of the United States respecting foreign proceedings as codified in chapter 15 of the Bankruptcy Code. The purpose of chapter 15 is set forth in section 1501 of the Bankruptcy Code and includes:

> (i) cooperation between: (a) courts of the United States, the United States Trustee, trustees, examiners, debtors, and debtors in possession; and (b) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases; (ii) greater legal certainty for trade and investment; (iii) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; (iv) protection and maximization of the value of the debtor's assets; and (v) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501.

115.    Section 1506 of the Bankruptcy Code provides that the Court is free to refuse to take any action governed by chapter 15 if such action would be manifestly contrary to the public policy of the United States.   However, this public policy exception is construed narrowly and applied sparingly by the courts.  In re Toft, 453 B.R. 186, 193 (Bankr. S.D.N.Y. 2011); see also In re Fairfield Sentry Ltd., 714 F.3d 127, 139 (2d Cir. 2013) (observing that the federal courts generally read the public policy exception "'restrictively'" and invoke it "only 'under exceptional circumstances concerning matters of fundamental importance for the enacting State'") (quoting Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency ¶ 89)); H.R. Rep. 109-31(1), 109 Cong., 1st Sess. 2005, reprinted in 2005 U.S.C.C.A.N. 88, 169 at 172 ("The word 'manifestly' [used in section 1506] in international usage restricts the public policy exception to the most fundamental policies of the United States.").

116.    To determine whether the relief sought would be manifestly contrary to the public policy of the United States, courts consider: "(1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of foreign main proceeding under Chapter 15 would 'severely hinder United States bankruptcy court' abilities to carry out . . . the most fundamental policies and purposes' of these rights."  In re British Isle of Venice (BVI), Ltd., 441 B.R. 713, 717 (Bankr. S.D. Fla. 2010).  Under this standard, for instance, the mere fact that a foreign representative requests relief that may not be available in the United States is not grounds for denying comity under section 1506.  See In re Bd. of Dirs. of Telecom Arg., S.A., 528 F.3d at 173 (stating that comity "does not require that foreign proceedings afford a creditor identical protections as under U.S. bankruptcy law"); Metcalfe & Mansfield, 421 B.R. at 697 ("The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical."); In re OAS S.A., 533 B.R. 83, 105 (Bankr. S.D.N.Y. 2015) ("Although Brazilian law

may impose different requirements for substantive consolidation, the different standards, standing alone, do not signify that Brazilian Bankruptcy Law is manifestly contrary to our own public policy."); In re Rede Energia S.A., 515 B.R. at 97 (finding that a Brazilian reorganization plan that violated the Bankruptcy Code's "absolute priority rule" was not manifestly contrary to public policy because creditors had a full and fair opportunity to participate in the Brazilian bankruptcy proceedings and Brazilian bankruptcy law meets U.S. fundamental standards of fairness and accords with the course of civilized jurisprudence). United States courts have gone so far as to hold that even the absence of a jury trial right—a right embodied in the United States Constitution— in a foreign proceeding would not justify refusal to recognize the foreign proceeding pursuant to the public policy exception. See In re Ephedra Products Liab. Litig., 349 B.R. 333, 335–36 (Bankr. S.D.N.Y. 2006).

117.   As discussed above, courts in the United States have previously recognized and given full force and effect to numerous foreign plans and orders that include third-party releases In Metcalfe & Mansfield, it was held that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions [appropriately granted in a foreign proceeding], even if those provisions could not be entered in a plenary chapter 11 case." 421 B.R. at 696. Similarly, in Avanti, it was found that the failure of a United States bankruptcy court to enforce releases of non-debtor guarantors could result in prejudicial treatment of creditors to the detriment of the debtor's reorganization efforts and prevent the fair and efficient administration of its restructuring. 582 B.R. 603, 618 (Bankr. S.D.N.Y. 2018). In both cases, the court relied on the fact that the affected creditors had a full and fair opportunity to be heard in a manner consistent with the due process standards of the United States. See id.; Metcalfe, 421 B.R. at 700; see also

Agrokor, 591 B.R. at 189-90 (holding that foreign restructuring plans that include third-party releases are entitled to comity if creditors had a full and fair opportunity to vote and be heard).

118.    Indeed, no court has found that such relief is manifestly contrary to the public policy of the United States, which is not surprising as such releases have been approved, under certain circumstances, in chapter 11 plans as well.  See In re Sino-Forest Corp., 501 B.R. at 665 (holding that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy").

119.    Here, the application of the Notes Amendments to the Obligors and of the releases to all of the Release Deed Beneficiaries is clearly permitted under Singapore law, and, as demonstrated above,  the Singapore Proceedings were both conducted in compliance with  relevant Singapore laws and comported with the United States standards of due process.  Foreign Law Expert Declaration ¶¶ 27, 32, 33.

120.    Failure to apply the Notes Amendments to the Obligors and the releases to all the Release Deed Beneficiaries could result in prejudicial treatment of certain creditors and parties in interest to the great detriment of the Debtors' restructuring efforts and will prevent the fair and efficient administration of the Schemes.  See Avanti, 582 B.R. at 606 ("Without releasing [non-debtor] guarantees, it would be difficult to restructure the debt because the collective assets and earnings of the group are needed to support the restructured debt without the risk of some creditors that hold the guarantees separately reaching the assets of the affiliates, endangering the group to meet its restructured debt obligations.").

121.    Moreover, the application of the Notes Amendments to the Obligors and of the releases to all the Release Deed Beneficiaries is also necessary to facilitate the support of certain Release Deed Beneficiaries who may be at risk of litigation, or who otherwise view the releases

as a form of consideration for their support of the Schemes.  If the Scheme Creditors can effectively evade the terms of the Scheme by commencing actions against the Release Deed Beneficiaries in the United States, the Release Deed Beneficiaries would be required to defend any such actions and could seek reimbursement or indemnification from the Group, which would deplete the resources of the restructured businesses.

122.    Thus, in order for the Debtors to fairly and efficiently achieve the restructuring of their financial obligations pursuant to the Schemes, and in furtherance of the goals and purpose of chapter 15, the Schemes, including the Notes Amendments and releases, must be enforced in the United States.

## V.    Chapter 15 Case Closure

123.    The primary purpose of these Chapter 15 Cases is to obtain the relief requested in the Proposed Order.  The Foreign Representative does not anticipate requiring any other or further relief from this Court or any reason for these Chapter 15 Cases to remain open upon entry of the Proposed Order and such order becoming final and non-appealable.

124.    Section 1517(d) of the Bankruptcy Code provides that a case under chapter 15 "may be closed in the manner prescribed under section 350," which, in turn, provides that a case may be closed "[a]fter an estate is fully administered."  Although a chapter 15 case has no "estate" to be administered, see In re Fairfield Sentry Ltd., 458 B.R. 665, 683 (S.D.N.Y. 2011), a party may apply for an order closing a bankruptcy case after substantially all issues have been resolved and the plan has been substantially consummated.  In re A.H. Robins Co., 219 B.R. 145 (10th Cir. 1998).  Bankruptcy Rule 5009(c) provides that the foreign representative shall "file a final report when the purpose of the representative's appearance in the court is completed. The report shall describe the nature of the results of the representative's activities in the court."  Fed. R. Bankr. P.

5009(c).  Rule 5009(c) further provides that, if no objection to a final report is filed within thirty (30) days, the estate is presumed to have been fully administered.  Id.

125.    Further, Local Bankruptcy Rule 5009-2(a) provides, "[i]n a case under chapter 15 of the Bankruptcy Code, the Court shall close the case when there is a presumption under Bankruptcy Rule 5009(c) that the case has been fully administered or the Court, after notice and a hearing, determines that the purpose of the foreign representative's appearance in the chapter 15 case has been completed, whichever is earlier."

126.    Here, the facts set forth herein demonstrate that, upon the Proposed Order becoming final, the purpose of these Chapter 15 Cases will have been fully achieved.  Accordingly, after the Proposed Order becomes final and non-appealable the requirements of section 350(a) of the Bankruptcy Code will have been satisfied.

## Notice

127.    The Foreign Representative proposes to notify creditors and other parties in interest of the filing of the Chapter 15 Petitions and this Motion in the manner set forth in the Foreign Representative's *Motion for Entry of an Order (I) Scheduling Hearing on Debtors' Motion for Recognition, (II) Setting Deadline for Filing Objections, and (III) Specifying the Form and Manner of Service of Notice*, which was filed contemporaneously herewith.  In light of the nature of the relief requested herein, the Foreign Representative submits that no other or further notice of the Chapter 15 Petitions, the Motion, or the Proposed Order is necessary or required.

## No Prior Request

128.    No previous request for the relief sought in the Chapter 15 Petitions has been made to this or any other court.

## **Conclusion**

WHEREFORE, the Foreign Representative respectfully requests that the Court (a)

enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, and (b) grant

such other and further relief as this Court deems appropriate under the circumstances.

Dated:       New York, New York                    Respectfully submitted,
             September 17, 2021

                                                   _/s/_ Matthew L. Brod_____

                                                   **MILBANK LLP**
                                                   Matthew L. Brod
                                                   Connor J. Haynes (*pro hac vice* pending)
                                                   55 Hudson Yards
                                                   New York, New York 10001
                                                   Tel:    (212) 530-5000
                                                   Fax:    (212) 530-5219

                                                   -and-

                                                   Andrew M. Leblanc
                                                   Samir L. Vora (*pro hac vice* pending)
                                                   1850 K Street, NW, Suite 1100
                                                   Washington, DC US 20006
                                                   Tel:    (202) 835-7500
                                                   Fax:    (202) 263-7586

                                                   *Counsel for the Foreign Representative*

## **Exhibit A**

**Proposed Recognition Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Chapter 15 |
| | |
| **Modernland Overseas Pte. Ltd.** *et al.*,[1] | Case No. 21-_____ (___) |
| | |
| **Debtors in a Foreign Proceeding.** | **(Jointly Administered)** |

---

## ORDER GRANTING (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION OF SANCTION ORDERS AND RELATED SCHEMES, AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

Upon the *Motion for (I) Recognition of Foreign Main Proceedings, or in the Alternative Foreign Nonmain Proceedings, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Orders and Related Schemes, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Motion" and, together with the Official Form 401 filed contemporaneously therewith for each respective Debtor, the "Chapter 15 Petitions")[2] of William Honoris, in his capacity as the duly appointed foreign representative (the "Foreign Representative" or "Petitioner") of the Singapore Proceedings of the above-captioned debtors (the "Debtors"), companies incorporated under the laws of Singapore, concerning schemes of arrangement (the "Schemes") pursuant to Section 71 of the Insolvency, Restructuring and Dissolution Act (No. 40 of 2018) (the "IRDA"), pursuant to sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520 and 1521 of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order (this "Order"),

---

[1]   The Debtors in these chapter 15 cases (the "Chapter 15 Cases") are: (a) Modernland Overseas Pte. Ltd., which is incorporated and registered in Singapore with unique entity number 201314695N; and (b) JGC Ventures Pte. Ltd., which is incorporated and registered in Singapore with unique entity number 201826857D.  Both entities have their registered office at 1 Marina Boulevard, #28-00, Singapore 018989.

[2]   Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Motion.

among other things: (i) recognizing the Singapore Proceedings as "foreign main proceedings," or in the alternative "foreign nonmain proceedings," pursuant to chapter 15 of the Bankruptcy Code; (ii) recognizing the Foreign Representative as a "foreign representative," as defined in section 101(24) of the Bankruptcy Code in respect of the Singapore Proceedings; (iii) recognizing, granting comity to, and giving full force and effect in the United States to the Singapore Proceedings, the Schemes, and the Sanction Orders; (iv) enjoining parties from taking any action inconsistent with the Schemes or the Sanction Orders in the United States; (v) authorizing the Debtors to seek entry of an order closing these Chapter 15 Cases upon notice of presentment and deeming the Motion to be the final report required to be filed by the Foreign Representative; and (vi) granting such other relief as this Court deems just and proper, all as more fully set forth in the Chapter 15 Petitions, the Foreign Representative Declaration and the Foreign Law Expert Declaration and the statements of counsel at the hearing before this Court with respect to the Chapter 15 Petitions (the "Hearing"); and appropriate and timely notice of the filing of the Chapter 15 Petitions and the Hearing having been given; and no other or further notice being necessary or required; and no objections or other responses having been filed that have not been overruled, withdrawn, or otherwise resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefor,

**THIS COURT HEREBY FINDS AND CONCLUDES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

B.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated as of January 31, 2012, Reference M-431, <u>In re Standing Order of Reference Re: Title 11</u>, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

C.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

D.      Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. § 1410.

E.      The Debtors have property rights within this district and, therefore, the Debtors are eligible to be debtors in a chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

F.      The Petitioner is the duly appointed "foreign representative" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code.

G.      The Chapter 15 Cases were commenced properly pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

H.      The Foreign Representative has satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rules 1007(a)(4) and 2002(q).

I.      The Singapore Proceedings are "foreign proceedings" pursuant to section 101(23) of the Bankruptcy Code.

J.      The Singapore Proceedings are entitled to recognition by this Court pursuant to sections 1515 and 1517 of the Bankruptcy Code.

K.      Singapore is the center of main interest of each Debtor, and, accordingly, the Singapore Proceedings are "foreign main proceedings" as defined in section 1502(4) of the Bankruptcy Code and are entitled to recognition as "foreign main proceedings" pursuant to section 1517(b)(1) of the Bankruptcy Code.

3

L.      As "foreign main proceedings," the Debtors are entitled to all the relief available pursuant to section 1520 of the Bankruptcy Code.

M.      The Debtors are entitled to all the relief set forth herein under sections 1507 and 1521(a) of the Bankruptcy Code.

N.      The relief granted herein is necessary and appropriate to effectuate the purposes of chapter 15, to protect the Debtors and the interests of their creditors and other parties in interest, and is consistent with the laws of the United States, international comity, public policy, and the policies of the Bankruptcy Code.

O.      Absent the relief granted herein, the Debtors may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative, or regulatory actions or proceedings in connection with claims against them in connection with the Notes Amendments, thereby interfering with and causing harm to the Debtors, their creditors, and other parties in interest in the Singapore Proceedings and, as a result, the Debtors would suffer irreparable injury for which there is no adequate remedy at law, a result contrary to the purposes of chapter 15.

P.      Each of the injunctions contained in this Order (i) is within this Court's jurisdiction; (ii) is essential to the success of the Singapore Proceedings and the Schemes; (iii) is an integral element of the Singapore Proceedings and the Schemes or the effectuation of the Sanction Orders; (iv) confers material benefits on, and is in the best interests of, the Debtors, their creditors, and other parties in interest in the Singapore Proceedings, including, without limitation, the Scheme Creditors; and (v) is important to the overall objectives of the Schemes.

Q.      Appropriate notice of the filing of the Chapter 15 Petitions and the Hearing was given, which notice is deemed adequate for all purposes, and no further notice need be given.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Chapter 15 Petitions and the relief requested therein is granted.

2.      All objections, if any, to the Chapter 15 Petitions or the relief requested therein that have not been withdrawn, waived, or settled as announced to this Court at the Hearing, or by stipulation filed with this Court, and all reservations of rights included therein, are hereby overruled on the merits.

3.      The Singapore Proceedings are each granted recognition as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code..

4.      The Foreign Representative is recognized as the duly appointed foreign representative of each of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each Debtor in its chapter 15 case.

5.      Upon entry of this Order, all relief afforded to a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code shall apply, including, without limitation, the application and protection afforded by the automatic stay under section 362 of the Bankruptcy Code to the Debtors and to the Debtors' property that is within the territorial jurisdiction of the United States; *provided*, *however*, that the relief provided under section 362 of the Bankruptcy Code (a) shall be subject to all of the exceptions set forth in section 362 and in section 1520 of the Bankruptcy Code and (b) shall not bar or stay any action that is permitted to be taken under the terms of the Sanction Orders and/or the Schemes. Without limiting the generality of the foregoing, this Order shall not be construed as enjoining the police or regulatory act of a governmental unit, including a criminal action or proceeding, to the extent not stayed pursuant to section 362 of the Bankruptcy Code or staying the exercise of any rights that section 362(o) of the Bankruptcy Code does not allow to be stayed.

6.      The Foreign Representative is established as the exclusive representative of each of the Debtors in the United States pursuant to sections 1521(a) and 1521(b) of the Bankruptcy Code, and the administration, realization, and distribution of all or part of the assets of the Debtors within the territorial jurisdiction of the United States is entrusted to the Foreign Representative.

7.      The Singapore Proceedings, the Schemes, and the Sanction Orders are recognized, granted comity, and entitled to full force and effect in the United States against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, including the application of the Notes Amendments to the Obligors and of the releases to all Release Deed Beneficiaries, and the Schemes and the Sanction Orders shall be binding and fully enforceable on all Scheme Creditors.

8.      All entities (as that term is defined in section 101(15) of the Bankruptcy Code) are permanently enjoined from (a) transferring, relinquishing, or disposing of any property of the Debtors located within the territorial jurisdiction of the United States or (b) taking or continuing any act to obtain possession of, or exercise control over, such property, in each case, to the extent inconsistent with the Schemes or the Sanction Orders.

9.      All entities (as that term is defined in section 101(15) of the Bankruptcy Code) are permanently enjoined and restrained from taking any action that is inconsistent with the Schemes or the Sanction Orders, or interfering with the enforcement and implementation of the Schemes or the Sanction Orders, including, without limitation, commencing, continuing, or enforcing any action or legal proceeding based on any claim, cause of action, or obligation released, waived, or deferred pursuant to the Schemes.

10.     The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

11.     The Foreign Representative and the Debtors and each of their respective successors, agents, representatives, advisors, and counsel shall be entitled to the protections contained in sections 306 and 1510 of the Bankruptcy Code, and no action taken by any such party in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the Singapore Proceedings, the Schemes, the Sanction Orders, this Order, the Chapter 15 Cases, or any adversary proceeding herein, or any further proceeding commenced hereunder, shall be deemed to constitute a waiver of the rights or benefits afforded such parties under sections 306 and 1510 of the Bankruptcy Code.

12.     The Chapter 15 Petitions satisfy the requirements of Bankruptcy Rule 5009(c), and the Foreign Representative's obligation to submit a final report in connection with the closure of the Chapter 15 Cases has been fulfilled.

13.     Upon this Order becoming a final, non-appealable order, the Foreign Representative is authorized to seek entry of a final decree by notice of presentment.

14.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, the Foreign Representative shall not be subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

15.     This Order is without prejudice to the Foreign Representative requesting any additional relief.

16.     The Foreign Representative shall serve a copy of this Order within three (3) business days of entry upon all persons or bodies as required under this Court's *Order (I) Scheduling Hearing on Debtors' Motion for Recognition, (II) Setting Deadline for Filing*

*Objections, and (III) Specifying the Form and Manner of Service of Notice.*  Such service shall be good and sufficient service and adequate notice for all purposes.

17.    This Court shall retain jurisdiction over all matters arising from or related to the enforcement, amendment, modification, implementation, and interpretation of this Order.

Dated:    New York, New York
    _____, 2021

_____

UNITED STATES BANKRUPTCY JUDGE